UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| COREY M. RICHERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:13CV476 JAR |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Corey Richerson's ("Richerson") application for disability insurance benefits pursuant to 42 U.S.C. § 423 and supplemental security income ("SSI") pursuant to under 42 U.S.C. § 1382.

**I.  Background**

On March 25, 2010, Richerson protectively filed applications for disability insurance under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* (Tr. 136-42), and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§1381, *et seq.* (Tr. 130-35). The Social Security Administration ("SSA") denied Richerson's claims on June 25, 2010. (Tr. 74-78)  He filed a timely request for a hearing before an administrative law judge ("ALJ") on August 19, 2010. (Tr. 81) Following a hearing on May 26, 2011 (Tr. 28-63), the ALJ issued a written decision on December 21, 2011 upholding the denial of benefits. (Tr. 12-27) Richerson requested review of the ALJ's decision by the Appeals Council. (Tr. 6)  On January 15, 2013, the Appeals Council denied Richerson's request for review. (Tr. 1-5) Thus,

the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000). Richerson filed this appeal on March 14, 2013. (Doc. 1) The Commissioner filed an Answer. (Doc. No. 9) Richerson filed a Brief in Support of his Complaint. (Doc. No. 17) The Commissioner filed a Brief in Support of the Answer. (Doc. No. 20) Richerson has not filed a Reply Brief in Support of his Complaint.

## II.      Decision of the ALJ

The ALJ determined that Richerson met the insured status requirements of the Social Security Act through December 31, 2014, and had not engaged in substantial gainful activity since June 17, 2009, the alleged onset date of disability. (Tr. 17) The ALJ found Richerson had the severe impairments of seizure disorder and major depressive disorder, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

After considering the entire record, the ALJ determined Richerson had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: "the claimant is unable to climb ladders, ropes or scaffolds. He is to avoid all operational control of moving machinery, working at unprotected heights, flames, working around open water, and the use of hazardous machinery. The claimant is limited to work that only involves simple, routine, and repetitive tasks in a low stress job defined as requiring only occasional decision making [sic] only occasional changes in the work setting." (Tr. 18)

The ALJ found Richerson capable of performing past relevant work as a store laborer and packager, which did not require the performance of work related activities precluded by his RFC.

(Tr. 22) Thus, the ALJ concluded that Richerson had not been under a disability as defined in the Social Security Act, from June 17, 2009, through the date of the decision. (Id.)

Richerson appeals, contending that the ALJ failed to properly consider Listing 11.03, and specifically failed to affirmatively quantify the frequency and duration of his seizure activity as required by 11.00A. Richerson also contends the ALJ failed to properly consider opinion evidence, and failed to properly consider credibility. The Commissioner maintains that the ALJ's decision was supported by substantial evidence on the record as a whole.

### III.   Administrative Record

The following is a summary of the relevant evidence before the ALJ.

### A.   Hearing Testimony

The ALJ held a hearing in this matter on May 26, 2011. The ALJ heard testimony from Richerson and J. Stephen Dolan, a vocational expert.

#### 1.   Richerson's testimony

Richerson was 35 years old at the time of the hearing. He testified as follows. He was married with four children, ages 16, 13, 8 and 5, and living with his parents in their home. (Tr. 36) He has not had a driver's license since November 2006, when it was suspended following a motor vehicle accident. (Id.) He graduated from high school and at the time of the hearing was enrolled in an accounting program at St. Louis Community College, where he attended classes three or four days a week. (Tr. 36-37) Richerson testified he has not worked since June 2009. (Tr. 38) He filed for unemployment benefits, but was denied. (Tr. 38)

From 2005-2009, Richerson worked as a retail store manager at Footlocker. (Tr. 39-40) His responsibilities included tracking inventory, training part-time employees, making sales, and setting schedules. (Id.) In this job he was required to lift more than 20 pounds. (Tr. 42) Richerson

was terminated for "discount abuse," i.e., selling items at below-retail prices more frequently than permitted. (Tr. 40-41)

Richerson also worked in food service for Airmark with responsibility for inventory and paperwork. (Tr. 41-42) He did not have to lift more than 20 pounds (Tr. 42)

Richerson worked for the St. Louis Board of Education in a warehouse doing light janitorial work and in food service for about ten years. (Tr. 42-43) He worked on the assembly line for Ford Motor Company and testified that he was terminated after suffering a seizure requiring a period of leave longer than he had actually been working for the company. (Tr. 44)

Richerson worked in the warehouse for Bookstores, pulling and packing books. (Tr. 44-45) He tried to avoid lifting in that job. (Tr. 45) In 1999, he left Bookstores to go to Key State Automotive Parts because they paid more. (Tr. 46) At Key State Richerson pulled orders and packed auto parts for different companies. He didn't have to do any lifting. (Tr. 45-46) It was Richerson's testimony that he was terminated from Key State because he told the owner he didn't like the way he was speaking to him. (Tr. 46) Richerson also had a part-time cleaning business for one year that he worked nights after working his regular job. (Tr. 47-48) He never realized a profit from this business. (Tr. 48)

Richerson was diagnosed with a seizure disorder at the age of 8. (Tr. 48) He testified that he typically has between 3 and 5 seizures in a day, and never goes a week without one. (Tr. 52) His seizures vary in intensity, and require a period of time for recovery. (Tr. 48-51) Richerson testified that the seizures are triggered by stress, hunger, excitement, upset, flashing lights, and a change of seasons (Tr. 51-52) He also has a history of grand mal seizures which are controlled by medication. (Tr. 53) He has issues affording his seizure medication. (Tr. 54)

Richerson further testified he had some problems with depression resulting from job loss which has improved. (Tr. 54-56) He has difficulty with concentration and memory (Tr. 56-57)

Richerson helps with household chores and yard work and occasionally does the grocery shopping (Tr. 57-58) He typically begins his day at 5:30-6:00 a.m. After getting his children to school, he studies from 10:00 a.m. to noon, and then naps for two to three hours. (Tr. 58) He goes to school in the evening, returns home to eat dinner, or he will sometimes prepare dinner. Then he sits and talks to his children about his day and goes to bed, typically between 11:30 and 1:00 a.m. (Tr. 58)

### 2. Testimony of Vocational Expert

Vocational expert, J. Stephen Dolan, testified regarding Richerson's past work, with skill and exertion levels, as follows. Richerson's most recent job was retail store manager, classified by the Dictionary of Occupational Titles ("DOT") as skilled, light work, but described as heavy in the file. (Tr. 59) Prior to that job, Richerson worked as a food service manager, a position also classified as skilled, light work in the DOT, but described as heavy in the file. (Tr. 59-60) Richerson's job with the Board of Education was a store laborer, which is unskilled, medium work. (Tr. 60) Richerson's position with Ford Motor Company as a motor vehicle assembler is unskilled, medium work according to the DOT, but described as light in the file. (Id.) Richerson has also worked as a shipping clerk, which is skilled, medium work, but light as testified. (Id.) Prior to that, Richerson worked as a hand packager, which is unskilled, medium work as classified in the DOT, but heavy as described in the file and light as testified. (Id.)

For hypothetical one, the ALJ asked Dolan to assume an individual of the claimant's age, education, and work experience with a no exertion limitation, except that the individual is unable to climb ladders, ropes or scaffolds, and is to avoid all operational control moving machinery,

hazardous machinery, working at unprotected heights, and exposure to flames or open water. (Tr. 60-61) The ALJ further limited this individual to simple, routine, repetitive tasks and jobs that require only occasional decision making and occasional changes in work setting. (Tr. 61) Dolan determined that such an individual could work as a hand packager and a store laborer. (Tr. 61)

For the second hypothetical, the ALJ asked Dolan to assume the same hypothetical individual is also limited to occupations that do not require exposure to flashing light. (Tr. 61-62) Dolan responded that such a limitation would reduce the numbers of both hand packagers and store laborers because it would eliminate jobs in factories where there might be forklifts or tow motors moving around flashing lights. (Tr. 62) Dolan further stated that employers customarily tolerate two unexcused or unscheduled absences in any given month for these types of jobs. (Id.)

**B.   Medical Records**

The ALJ summarized Richerson's medical records at Tr. 19-20. Relevant medical records are discussed as part of the analysis.

**IV.   Standards**

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work

exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his

past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v).

Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

It is not the job of the district court to reweigh the evidence or review the factual record de novo. Id. (citing Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Id. at 1229-30 (citing Masterson v. Barnhart, 363 F.3d 731, 736 (8th Cir.2004). The factual findings of the ALJ are conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g). This Court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Meyerpeter, 902 F.Supp.2d at 1230 (citing Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2002)).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

    (1) The findings of credibility made by the ALJ;

    (2) The education, background, work history, and age of the claimant;

    (3) The medical evidence given by the claimant's treating physicians;

    (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

    (5) The corroboration by third parties of the claimant's physical impairment;

    (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

    (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

### V. Discussion

In his appeal of the Commissioner's decision, Richerson makes the following arguments: (1) the ALJ failed to properly consider Listing 11.03; (2) the ALJ failed to properly consider the medical opinion evidence; and (3) the ALJ failed to properly consider his credibility.

#### A. Credibility

The Court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Richerson's credibility was essential to his determination of other issues, including whether Richerson met or medically equaled a listed impairment. See Shell v. Astrue, 2012 WL 2191282, at *6 (E.D. Mo. May 14, 2012) (citing Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.").

Deference is given to the ALJ's conclusion with regard to credibility determinations. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Moore v. Astrue, 572 F.3d at 524 (citing Holmstrom v. Massanari, 270 F.3d 715, 721

(8th Cir. 2001)). In evaluating a claimant's credibility, the ALJ should consider the claimant's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). The claimant's relevant work history and the absence of objective medical evidence to support the complaints may also be considered, and the ALJ may discount subjective complaints if there are inconsistencies in the record as a whole. Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (citing Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Id. (citing Hall v. Chater, 62 F.3d 220, 223 (8th Cir.1995)). The Court will uphold an ALJ's credibility findings, so long as they are adequately explained and supported. Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005). Here, the ALJ identified several reasons for discounting Richerson's credibility, including his noncompliance with suggested treatment, the lack of objective medical evidence, and his activities of daily living.

In making a credibility determination, an ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to take prescription medication or seeking treatment. See Choate, 457 F.3d at 872 (and cases cited therein). In May 2007, more than two years prior to the onset of his alleged disability, Richerson presented to the emergency room at St. Louis University Hospital due to seizure activity caused by his admitted failure to take his medication as directed. (Tr. 244-46, 253). During the relevant period, Richerson reported to Dr. Schultz that he was taking just one of the two drugs prescribed him to control his seizures. (Tr. 20, 317) He told Dr. Schultz he had a pill box to help him remember to take his medications, but did not use it, and had missed "a few doses per month." (Tr. 19, 263) Richerson also told Dr. Graham he was only taking one of his two prescribed seizure medications, and that

10

although he had been prescribed antidepressant medication, he had never filled the prescription. (Tr. 21, 306) The record did not establish significant adverse side effects from the medications.

Further, the record indicates that when Richerson takes his medication as prescribed, his symptoms are under control. Dr. Hogan noted that Richerson's grand mal seizures occurred only when he failed to take his medication. (Tr. 20, 291, 293) Richerson himself testified that as long as he took his medication, he had no problems with grand mal seizures. (Tr. 19, 53) "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010); Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729-30 (8th Cir. 2003).

Richerson argued the ALJ failed to consider that both treating and non-treating sources confirmed that he had no health insurance and could not afford his medications or further treatment. (Doc. No. 17, p. 15) Although economic justifications for the lack of treatment can be relevant to a disability determination, see Bridges v. Astrue, 2012 WL 3637712 at *4 (W.D. Mo. Aug. 22, 2012), here Richerson offered no testimony or other evidence to show he had been denied access to prescription medicine or treatment due to financial constraints. In Goff, 421 F.3d at 793, the claimant asserted she was not able to take prescription medications because she lacked the financial means to obtain treatment. The Eighth Circuit noted that "there is no evidence [claimant] was ever denied medical treatment due to financial reasons. Without such evidence, [claimant's] failure to take . . . medication is relevant to the credibility determination." Id. (citing Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994)). Moreover, Richerson admitted he was provided with "payment assistance program information." (Tr. 319)

As part of his credibility determination, the ALJ also considered the absence of objective medical evidence supporting the degree of severity alleged. See Gonzales v. Barnhart, 465 F.3d

11

890, 895 (8th Cir. 2006) (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir.2002) ("[A]n ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."). Richerson's dosage of medications, and in particular carbamazepine,[1] had been the same "for years." (Tr. 256-57) A brain MRI performed in 2001 was normal. (Tr. (Tr. 20, 263, 266, 317) Likewise, neurological examinations conducted by Drs. Schultz (Tr. 264-65, 267-68, 318), Tseng (Tr. 259) and Hogan (Tr. 292-93), were unremarkable.

Richerson argues the ALJ failed to consider the whole record when he ignored a video EEG which he says provides objective evidence of multiple seizures during the testing period. (Tr. 263) "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." Wildman, 596 F.3d at 966 (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998)). "Moreover, '[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.' " Id.

As correctly pointed out by the Commissioner, the *fact* of Richerson's seizure activity is undisputed; the focus of the ALJ's analysis was on the *functional limitations* related to that seizure activity. (Doc. No. 20, p. 11) The ALJ noted that no doctor had rendered an opinion that Richerson was unable to work. (Tr. 21) See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (lack of restrictions by treating physicians supports the ALJ's determination that plaintiff was not disabled). In fact, the evidence of record suggests Richerson is unemployed for reasons unrelated to his medical condition. The ALJ pointed out that Richerson was terminated for discount abuse

---

[1] Carbamazepine (Tegretol) is used alone or in combination with other medications to control seizures. It is an anticonvulsant that works by reducing abnormal electrical activity in the brain. Available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682237.html#why. (Last updated July 16, 2012).

and thereafter opted to go to school rather than seek other employment. (Tr. 22) The ALJ properly relied on this fact in discrediting Plaintiff's allegations. See Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir.2009). "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." Galvan v. Astrue, 2011 WL 4501067, at *7-8 (E.D.Mo. Sept. 28, 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir.2005). See also Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir.2001) (noting that ALJ's finding that plaintiff was not fully credible was supported by the fact that plaintiff did not lose his job because of his disability, but because his position was eliminated).

Also detracting from Richerson's credibility is the fact that he applied for unemployment benefits, thereby holding himself out as able to work. (Tr. 38) Applying for unemployment benefits is evidence negating a claim of disability. Carpenter v. Astrue, 2008 WL 3306298, at *13 (E.D. Mo. Aug. 7, 2008) (citing Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998)).

Finally, the ALJ found Richerson's statements concerning the intensity, persistence and limiting effects of his symptoms were inconsistent with his activities of daily living, despite having suffered from seizures since childhood. (Tr. 22) He attends college classes regularly and studies. He is able to shop, do household chores and get his children off to school in the morning. The ALJ concluded that the frequency of ongoing seizures and blackouts as described by Richerson, if credible, would necessitate hospitalization, evaluation and treatment, and would be completely inconsistent with sustaining concentration, persistence and pace for going to college classes, studying and regularly doing household chores. (Id.) While it is true that a claimant need not be bedridden in order to be unable to work, see Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007), here Richerson engages in extensive daily activities with minimal limitations.

The ALJ's opinion demonstrates that he properly considered the Polaski factors in assessing Richerson's credibility. Accordingly, the Court finds the ALJ's credibility determination is supported by substantial evidence in the record as a whole.

### B. Listing 11.03 Epilepsy—nonconvulsive epilepsy

The burden of proof is on the claimant to establish that his impairment meets or equals a listing. Soutiea v. Colvin, 2013 WL 1316028, at *2 (E.D.Mo. Mar. 29, 2013) (citing Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir.2004)). The specified criteria for Listing 11.03 are as follows:

> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.[2] With alteration of awareness or loss of consciousness and transient postictal[3] manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Part 404, Subpart P. Appendix 1, § 11.03. An impairment cannot meet the criteria based on a diagnosis alone. 20 C.F.R. § 416.925(d). To meet the requirement of a Listing, the medically determinable impairment must meet all of the criteria of the Listing. Id; Baker v. Colvin, 2013 WL 5770600, at *4 (E.D. Mo. Oct. 24, 2013). "An impairment that manifests only some of these criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

---

[2] "Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in Listing 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels." Dakin v. Astrue, 2010 WL 1253632, at *24 (W.D.Mo. Mar. 31, 2010).

[3] Postictal means occurring after a seizure or sudden attack. Flanery v. Chater, 112 F.3d 346, 349 fn. 9 (8th Cir. 1997).

As the basis for his conclusion that Richerson did not meet or medically equal Listing 11.03, the ALJ found that no EEG abnormalities had been shown since the alleged onset date and that the frequency of the seizure activity described at the hearing was not supported by any medical source or by the preponderance of the credible evidence of the record. (Tr. 17-18) The medical evidence showed a brain MRI performed in May 2001 was normal. (Tr. 20, 263, 266, 317) Neurological examinations conducted in October 2010, February 2011, March 2011, June 2011, and January 2012, were normal. (Tr. 259, 264-65, 267-68, 293, 318) Indeed, Richerson has not required hospitalization since his alleged onset date. Although laboratory test results from August 2010 showed a therapeutic serum drug level (Tr. 269), the ALJ noted repeated instances of Richerson's failure to comply with his doctors' instructions and take his medications as prescribed.

Richerson argues the ALJ failed to affirmatively quantify the frequency and duration of his seizure activity as required by Listing 11.00A.[4] (Doc. No. 17, pp. 7-8) He claims this affected the outcome of the case because the ALJ did not ask the VE whether an employer would tolerate unscheduled breaks during the workday to accommodate the frequency and duration of Plaintiff's seizure activity. (Id., p. 8) An ALJ posing a hypothetical to a vocational expert is not required to include all of a claimant's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical"). See also Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988) ("Although the hypothetical question "must precisely set out all of the claimant's impairments, the hypothetical question is sufficient if it sets forth the impairments which the ALJ accepts as

---

[4] Listing 11.00A provides that in epilepsy, degree of impairment will be determined according to type, frequency, duration and sequelae of seizures. At least one detailed description of a typical seizure is required, including the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena.

true.") As discussed in detail above, the ALJ properly discredited Richerson's statements concerning the intensity, persistence and limiting effects of his seizure activity to the extent they were inconsistent with his RFC assessment.

When the record is viewed as a whole, the Court finds the medical evidence of record, combined with the ALJ's decision to discredit Richerson's testimony regarding the duration and frequency of his seizure activity, provides substantial evidence for the ALJ's determination that Richerson did not meet or equal Listing 11.03. See Bates v. Colvin, 2013 WL 6838711, at *5 (E.D.Mo. Dec. 27, 2013) (where the record established that claimant appeared to have exaggerated her complaints, ALJ did not err in finding she did not meet the listings); Dakin, 2010 WL 1253632 (where no doctor ever observed claimant having a seizure, no one other than claimant testified as to the description of type and frequency of claimant's seizures, and where there was no evidence of any unconventional behavior or significant interference with activity during the day, claimant's impairment did not meet or equal listing 11.03).

**C. Medical opinions**

Richerson argues that the ALJ did not explain the weight given to the opinions of the three consultative examiners, Michael Armour, PhD., Bridget Graham, PsyD., and Patrick Hogan, M.D. (Doc. No. 17, pp. 9-11) In particular, Richerson argues the ALJ failed to address Drs. Armour and Graham's opinions that he had a moderate to severe impairment in his ability to interact socially and adapt to the demands of his environment. Because their opinions post-dated the administrative hearing, the ALJ failed to obtain VE testimony to determine whether a moderate to severe impairment to interact socially and adapt to the demands of his environment would affect his ability to perform past work at step four or the type and number of jobs in the

national economy at step five. As a result, he contends his RFC determination was not supported by substantial evidence.

On June 29, 2011, Dr. Armour observed Richerson's affect or perceived emotion as limited in range because he did not show much emotional expression or variation; however, the emotion he did show was found appropriate to the subject of discussion and to his self-reported mood. (Tr. 279) Richerson reported insomnia over the past year, reduced energy level, loss of interest in previously-enjoyed activities, and increased depression since he lost his job in 2009. (Tr. 279) Dr. Armour diagnosed mild Major Depressive Disorder. (Tr. 280) Based on a "reasonable degree of professional certainty," Dr. Armour opined that Richerson was mildly impaired in his ability to make complex work-related judgments, but otherwise unimpaired in his ability to understand and follow instructions; moderately impaired in his ability to sustain concentration and persistence; and moderately impaired in his ability to interact appropriately with the public and work colleagues, and adjust to changes in the work place (Tr. 280-81, 285-86). Dr. Armour further opined that Richerson had a moderate to at times severe impairment in his ability to interact socially and adapt to the demands of his environment. (Tr. 280-81)

Richerson saw Dr. Bridget Graham on August 1, 2011. (Tr. 305-14) Dr. Graham echoed Dr. Armour's medical source statement findings in all pertinent respects (Tr. 285-86, 312-13), and concurred with Dr. Armour's diagnosis of mild Major Depressive Disorder. (Tr. 311) Dr. Graham concluded that Richerson's depressive symptoms were likely to impact his ability to interact socially and adapt to his environment because he continues to demonstrate the affective symptoms of depression, including low energy, lack of interest in pleasurable activities, and the tendency to isolate and withdraw from other people and social situations. (Tr. 310)

Richerson is correct that the regulations require the ALJ to weigh the opinions of the examining physicians; however, they do not explicitly state that the ALJ must specify the weight he attributes to each physician, see 20 C.F.R. §§ 404.1527 and 416.927, and the failure to do so is not conclusive proof that he did not weigh the options. See Hepp v. Astrue, 511 F.3d 798, 806-07 (8th Cir. 2008). Here, although the ALJ did not specifically identify the weight accorded to each physician's opinion, he considered the actual full reports of both Drs. Armour and Graham and determined they were consistent with Richerson only being restricted in his capacity to work rather than being unable to work. (Tr. 21) The ALJ found that Richerson, despite having had some depressive symptoms, had adequate ability to maintain concentration, persistence, and pace for simple, routine tasks with only occasional decision-making. (Id.) He further noted Richerson had consistently declined treatment for depression. (Tr. 257) According to the record, Richerson was once prescribed anti-depressant medication, but never filled the prescription. (Id.) In addition, Richerson had not required emergency room treatment or hospitalization related to his emotional condition. (Tr. 21-22)

Moreover, an ALJ posing a hypothetical to a vocational expert is not required to include all of a claimant's limitations, but only those which he finds credible. Goff, 421 F.3d at 794. See also Rautio, 862 F.2d R 180 (8th Cir. 1988) citing Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985)). According to the Commissioner, the only portion of Drs. Armour and Graham's opinions the ALJ did not credit concerned Richerson's social limitations. (Doc. No. 20, p. 15) Evidence that Richerson attended college, had friends, shopped in stores, and had worked in a customer-service job, led the ALJ to conclude he was not limited in that realm. (Tr. 22)

With respect to Dr. Hogan, Richerson argues the ALJ failed to properly evaluate his opinion pursuant to 20 C.F.R. § 404.1527. In weighing medical opinion evidence, the ALJ is

required to consider six factors. 20 C.F.R. § 404.1527(c). The first three factors analyze the doctor's treatment relationship with the claimant, including the length of treatment and the type of relationship, in order to determine whether the doctor is familiar enough with the claimant to justify assigning the opinion greater weight. Id. The other three factors consider whether the doctor supported his opinion with specific facts or evidence, whether the doctor's opinion is consistent with other evidence and opinions, and whether there are "other facts" including the doctor's familiarity with the claimant's case. Id. No single factor is weighed more heavily than another. Id. See Hyde v. Colvin, 2013 WL 5322779, at *2 (W.D. Mo. Sept. 23, 2013).

Richerson saw Dr. Hogan on July 27, 2011. (Tr. 291-304) He described two types of seizures: ones that lasted for less than a minute and occurred always during or immediately preceding sleep; and other more severe grand mal seizures which occurred only occasionally, "if his medications get low." (Tr. 291) Dr. Hogan diagnosed convulsive disorder, partial complex seizures with occasional 3-4 per year major motor convulsions. (Tr. 293) Dr. Hogan's neurological exam of Richerson was otherwise normal. (Tr. 293) Dr. Hogan concluded that Richerson had no significant limitations on his physical abilities, but should avoid unprotected heights, moving mechanical parts, and possibly operating a motor vehicle. (Tr. 298-302)

The ALJ gave substantial weight to Dr. Hogan's opinion, based on his neurological examination. The ALJ found Richerson's description of his seizure activity to Dr. Hogan was substantially different than what he had described at the hearing, i.e., spells of dizziness with blackouts on multiple occasions almost daily. (Tr. 21) The ALJ found that an individual could not be expected to hold a job with almost daily blackouts; however, Richerson had a good work history despite his complaints. (Id.) The ALJ's discussion of which functional limitations he found credible and which he did not is evidence of the weight he gave to Dr. Hogan's opinions.

Irvin v. Astrue, 2011 WL 4067509, at *3 (W.D.Mo. Sept. 13, 2011). Thus, the Court finds the ALJ properly weighed the medical opinions of record.

**VI.** **Conclusion**

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

Dated this 29th day of September, 2014.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**